FILED & ENTERED

NOV 27 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Palmdale Hills Property, LLC, and its related debtors<br><br><br><br>Debtor(s).<br>―――――――――――――――――――<br>Steven M Speier<br><br>Plaintiff(s),<br><br>v.<br><br>Argent Management, LLC,  SunCal Management LLC<br><br><br>Defendant(s). | Case No.:  8:08-BK-17206-ES<br>Adv No:   1:16-ap-01125-GM<br><br>**SUPPLEMENTAL MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART (Dkt. 311)**<br><br><br><br>Date:  November 14, 2017<br>Time:  10:00 a.m.<br>Courtroom:  303 |

Defendants SunCal Management, LLC ("SCM") and Argent Management, Inc. ("Argent" and, with SCM, the "Defendants") brought a motion for summary judgment (dkt. 311; the "MSJ") on the first claim for relief (Breach of Contract) and the second claim for relief (Unjust Enrichment and/or Restitution) by plaintiff Stephen M. Speier (the

"Trustee"), as chapter 11 trustee and liquidating trustee for debtor SunCal Oak, LLC

(the "Debtor"), or, in the alternative, for partial summary adjudication.  The Trustee filed

an opposition to the MSJ (dkt. 316; the "Opposition") and the Defendants filed a reply to

the Opposition (dkt. 329; the "Reply").  On May 30, 2017 the Court held a hearing on the

MSJ.

On August 2, 2017, the Court entered an order (dkt. 343; the "Order") and a

memorandum of decision (dkt. 342; the "Memorandum of Decision" or "Memorandum"),

which granted the MSJ on the first claim for relief (Breach of Contract) and continued

the hearing on the MSJ to give the parties additional time to present evidence on an

issue relevant to the second claim for relief (Unjust Enrichment/Restitution): whether

SCM's damages arising from the Debtor/Trustee's breach of contract exceeded

payments by the Debtor to SCM.

The Memorandum provided in relevant part:

The Oak Knoll Project called for the development of a 168-acre former naval

medical center purchased from the United States for $100.5 million (the "Property")

into a planned community with 960 residences (single family homes, townhomes, and

apartments) and 72,000 square feet of retail, by selling fully-entitled and buildable lots

to merchant builders. [UF Nos. 1, 2, 3, 14, 17][1] [*Footnotes from the Memorandum are

omitted from this tentative ruling.*]

In order to develop the Oak Knoll Project, the Debtor and SCM entered into a

Development Management Agreement dated December 29, 2005 (Dec. of Bruce V.

Cook, Ex. 6; the "DMA"). [UF No. 19] In general terms, the DMA provided that SCM

would manage the development of the Project and the Debtor would fund that

development, including the payment of management fees to SCM. [UF Nos. 27, 28]

Section 5.1 of the DMA provided that the Debtor would pay SCM (a) an

"Operating Management Fee" of 3% of (i) gross sales revenue from the Project and (ii)

---

[1] UF refers to the Defendants' Uncontroverted Facts, as set forth in Defendants' Statement of
Uncontroverted Facts and Conclusions of Law [dkt. 311-1].

1  net proceeds from the funding of any related community facilities districts and (b) a

2  "Sales Management Fee" of 1% of gross sales revenue. [UF Nos. 130, 131]  (The

3  Operating Management Fee and the Sales Management Fee are collectively referred to

4  as the "Management Fee.") The first 2% of the gross revenue was to be paid to SCM in

5  equal monthly installments (calculated based on expected gross sales revenues) during

6  the development of the Project, with the remainder of the Management Fee to be paid

7  upon the close of escrow of each sale. [UF Nos. 133-136]

8        Section 5.3 of the DMA also provided that the Debtor would reimburse SCM for

9  third-party out-of-pocket expenses incurred by SCM and for the compensation SCM paid

10  to employees and contractors who directly worked on the Project.  Certain expenses,

11  such as insurance, salaries of senior level management not devoted exclusively to the

12  Project, and overhead expenses relating to SCM's home office, remained the sole

13  responsibility of SCM. [UF No. 132]

14      ....

15        SCM worked extensively to develop the Oak Knoll Project (*see* the list of work

16  performed at 13:26-14:28 of the Motion).  [UF Nos. 93-117]  Between the signing of the

17  DMA on December 29, 2005 and the Debtor's November 19, 2008 petition date the

18  Debtor paid SCM approximately $4 million in management fees (about

19  $158,000/month) and $3 million for expenses.  [UF Nos. 162, 163]

20        After Lehman filed for bankruptcy on September 15, 2008, Lehman refused to

21  fund the Oak Knoll Project. The Debtor accordingly stopped making payments to SCM

22  and SCM was accordingly unable to continue developing the Project. [UF No. 167, 170-

23  173,182] SCM asserts that the Oak Knoll Project was 30 days from the completion of its

24  entitlement package, which would have substantially increased the value of the Project.

25  On November 19, 2008, the Debtor was placed in bankruptcy. The Trustee, as chapter

26  11 trustee, decided not to continue with entitlement or other development of the Oak

27  Knoll Project. In 2012, under the relevant Plan and Confirmation Orders, the Oak Knoll

28  Project was conveyed to Lehman on an "as is" basis for $48 million.  [UF Nos. 200, 201]

….

The Debtor/Trustee's material breach of the DMA excuses SCM's further performance and precludes a breach of contract claim by the Trustee against SCM….

….

An unjust enrichment claim under California law requires "receipt of a benefit and unjust retention of the benefit at the expense of another." *Hirsch v. Bank of Am.,* 107 Cal. App. 4th 708, 717 (2003) (quoting *Lectrodryer v. SeoulBank,* 77 Cal. App. 4th 723, 726 (Cal. Ct. App. 2nd Dist. 2000)). "[R]elief is available under this theory upon a determination that under the circumstances and as between the two individuals, it is unjust for the person receiving the benefit to retain it. (Rest., Restitution, § 1, com. c, p. 13 . . . ." *Id.* at 722. The Trustee asserts that "allowing SCM to retain fees in excess of the Project's final value would unjustly enrich SCM" [SAC ¶87] and deprives the Debtor of the exchange it expected [Opposition at 28:5-6].

While a valid contract governing the rights of parties generally serves to bar an unjust enrichment claim, *see, e.g., Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,* 96 F.3d 1151, 1167 (9th Cir. 1996),

> California law allows a breaching party to recover under an unjust enrichment theory for the benefit conferred upon the non-breaching party minus damages to the non-breaching party. *See United States ex rel. Palmer Constr., Inc. v. Cal. State Elec., Inc.*, 940 F.2d 1260, 1262 (9th Cir.1991) (citing 12 S. Williston, A Treatise on the Law of Contracts §§ 1479-84 (3d ed. 1970) (Williston); 1 B. Witkin, Summary of California Law (Contracts) §§ 91-96 (9th ed.1987); 55 Cal.Jur.3d (Restitution) § 66-67 (1980)).

*Billfish, Inc. v. Campbell*, 187 F.3d 646 (9th Cir. 1999)(unpublished opinion); *see also United States v. Alvarez*, 999 F.2d 544 (9th Cir. 1993)("traditionally analyzed as an issue of restitution in favor of a party in breach"); *Harriman v. Tetik*, 56 Cal. 2d 805, 811 (Cal. 1961)(to avoid unjust enrichment, even a willfully defaulting party may recover consideration paid to the extent he could show it exceeded damages to other party).

It is undisputed that the Debtor conferred a benefit of $4 million of payments for management fees and $3 million of payments for expenses. Under California law, the

Trustee has a claim for unjust enrichment (or restitution) unless the damages to SCM exceeded this $7 million benefit conferred on SCM. So, if the Defendants could establish as a matter of undisputed fact that SCM's damages exceeded the approximately $7 million paid by the Debtor, the Defendants would be entitled to summary judgment on this unjust enrichment claim.

The Court does not know whether SCM could establish that its damages exceeded $7 million. The amount of SCM's damages from the Debtor/Trustee's breach of the DMA was not originally at issue in this MSJ, so the parties have neither briefed nor submitted evidence regarding the amount of such damages.[2]  The Court will continue this MSJ for the purpose of allowing the parties to provide evidence of the amount of SCM's damages.

As a general matter of contract law, SCM's damages for the Debtor/Trustee's breach of the DMA would be expectation damages.

> Damages awarded to an injured party for breach of contract "seek to approximate the agreed-upon performance." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515, 28 Cal.Rptr.2d 475, 869 P.2d 454 (Applied ).) The goal is to put the plaintiff "in as good a position as he or she would have occupied" if the defendant had not breached the contract. (24 Williston on Contracts (4th ed.2002) § 64:1, p. 7.) In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain. (Id. at pp. 9–10; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 813, pp. 732–733 . . . .

*Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified Sch. Dist.,* 34 Cal. 4th 960, 967–68 (Cal. 2004); *see also* Cal. Civ. Code §3300.  For SCM to be put in as good a position as performance, the Court expects that SCM would need to receive (i) its expected net profits under the DMA (the total expected Management Fees less remaining expected, non-reimbursable costs of performance) and (ii) all incurred, reimbursable costs.  The Court would consider different measurements of SCM's damages that are supported by relevant fact and applicable law.

---

[2] While the Defendants have submitted evidence of work done by SCM on the Project, they have not submitted evidence of its cost or any other evidence about the amount of SCM's damages from the Debtor's breach of the DMA.

1  The Defendants filed a supplemental statement on this issue (dkt. 347; the

2  "Supplemental Statement"), the Trustee filed a supplemental opposition (dkt. 348; the

3  "Supplemental Opposition"), and the Defendants filed a reply to the Supplemental

4  Opposition (dkt. 354; the "Supplemental Reply").  On November 14, 2017, the Court

5  held a hearing on this issue.

6

7  **Defendant's Supplemental Statement** - The Defendants argue as follows:

8

9  Burden of Proof

10  In a motion for summary judgment, the defendant need not present any evidence

11  on issues on which the plaintiff bears the burden of proof.  The defendant may show the

12  absence of a genuine issue of fact by pointing out the absence of evidence supporting

13  the Plaintiff's claim.

14  The burden of proof is on the plaintiff to establish unjust enrichment and thus

15  entitlement to restitution.  Thus, it is a matter of black letter law that the defaulting

16  party/plaintiff bears the burden of proving that the benefit conferred on the defendant

17  exceeded the defendant's damages from the plaintiff's breach.  If net enrichment of the

18  defendant cannot be established, the plaintiff has not established unjust enrichment and

19  is not entitled to restitution.  Any doubts should be resolved in favor of the non-

20  defaulting defendant, who should never be left with a "net loss" from the transaction.

21

22  Evidence that Payments to SCM Exceeded SCM's Damages

23  While the Debtor did pay $4 million in management fees and $3 million in

24  expense reimbursements to SCM, there is no evidence that these amounts exceed

25  SCM's costs and damages. To receive the $4 million in management fees, SCM had to

26  perform its development management duties under the DMA; SCM has established that

27  it performed an extraordinary amount of work developing the Project and incurred

28  substantial (and non-reimbursed) costs.  The Debtor has not shown that the $4 million

in payments exceeded SCM's costs of performance.  The $3 million in expense reimbursement was on account of $3 million in costs that SCM had incurred, thus there was no net benefit to SCM.

Under the DMA, SCM expected to be paid an additional $17 million if the Project were fully developed.  As of May 2008, the agreed Project Budget reflected anticipated gross sales revenue of $522 million, with anticipated management fees (at 4% of gross sales) of $21 million.  SCM has received only $4 million of this $21 million.

If the Debtor terminated the DMA, SCM was entitled to receive 90% of the management fee that would otherwise have been payable under the DMA.  90% of $21 million is $19 million.  Again, the Debtor has received only $4 million of this $19, leaving $15 million of SCM's liquidated damages under the DMA unpaid.

It is impossible to establish exactly the cost to SCM to complete its performance under the DMA.  However, the fee and cost reimbursement in the DMA were intended to comply with industry standards.  The expectation was that the management fees would cover SCM's costs and provide a modest profit margin of 10-15%.  It was also anticipated that the periodic payments to SCM would not cover all of the costs it had incurred; SCM would suffer a net loss under the DMA until the end of the Project when the lots were sold and SCM received the other half of its management fee.

SCM has also incurred legal expenses due to the Debtor's breach.  The DMA provides for the recovery of such fees by the prevailing party in any litigation of the enforcement or interpretation of the DMA.  DMA §9.6. As this Court has adjudicated the Trustee's breach of contract claim in favor of SCM, SCM is entitled to reimbursement of attorney's fees.

Conclusion

The Trustee has presented no evidence that SCM (i) received a net benefit and (ii) is not being penalized and will not be left with a "net loss."  From the Trustee's own deposition and responses to written discovery requests, it is clear that (i) the Trustee

1   has no evidence that the benefit to SCM exceeds the injury to SCM caused by the

2   Debtor's breach and (ii) the Trustee does not even know the scope of services provide

3   by SCM, let alone the cost of such services.

4         In calculating SCM's damages from the Debtor's breach, SCM's prospective

5   profits should not be reduced by fixed expenses that neither increased nor decreased

6   as a result of nonperformance of the contract.

7

8   **Trustee's Memorandum in Opposition** - The Trustee argues as follows:

9         By arguing that the Court "inadvertently reserved the burden of proof" (in asking

10   the Defendants to submit evidence that their damages from the Debtor's breach of

11   contract exceeded the benefit conferred upon SCM by the Debtor), the Trustee is

12   making a thinly disguised motion for reconsideration.

13         In fact, Ninth Circuit case law makes clear that the burden is on SCM: as the

14   moving party without the ultimate burden of persuasion at trial, it has the initial burden of

15   production and the ultimate burden of persuasion on a motion for summary judgment.

16   *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099 (9th Cir. 2000).  The

17   moving party must "point to materials on file which demonstrate that [the non-moving]

18   party will not be able to meet that burden [of persuasion]." 210 F.3d at 1105 (quoting

19   *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  The Defendants have utterly failed to

20   make this demonstration.  The discovery cited by the Defendants in the Supplement

21   does not address SCM's damages or lost profits.  The cited interrogatories concern the

22   value of the services provided by SCM and cited deposition testimony is also irrelevant

23   as the Trustee was not asked any questions regarding SCM's damages or lost profits.

24         The Defendants have not presented any evidence of the amount of damages

25   SCM allegedly incurred as a result of the Debtor's alleged breach of the DMA.  In fact,

26   they claim that it is impossible to establish what it would have cost SCM to perform the

27   work required to complete the Project.  If true, this means it would be impossible for

28   SCM to establish its lost profits.

DMA §6.2., which sets forth the termination fees that SCM would have been entitled to had the Debtor terminated SCM without cause, is inapplicable where the Debtor allegedly defaulted.  Furthermore, this fee is contingent on SCM's performance of its obligations under §6.4 of the DMA.  The DMA's attorney's fees provision applies by its terms only to actions in contract and is inapplicable in an action in quasi-contract.  Furthermore, the Defendants fail to (i) explain how the attorneys' fees were proximately caused by the Debtor's breach or (ii) set forth the amount of these attorneys' fees.

Bruce Elieff's testimony – based on a May 2008 budget - that SCM expected to be paid an additional $17 million in gross management fees and hoped to achieve a 10-15% profit margin is speculation.  It is accordingly not admissible as expert opinion testimony under Federal Rule of Evidence 702 because it lacks a reliable basis.  Furthermore, the parties have not identified experts, exchanged expert reports, or conducted expert discovery, so use of expert testimony is premature.

Elieff's opinion is not admissible as lay opinion testimony because he relied on specialized knowledge and industry standards rather than being "rationally based on the witness's perception." Fed. R. Evid. 701.  While the Advisory Committee Note to the 2000 amendments to Rule 701 does state that "most courts have permitted the owner or officer of a business to testify as to the value or projected profits of the business without the necessity of qualifying the witness as an accountant, appraiser, or similar expert," this has been limited to where the owner had sufficient personal knowledge to so testify or the valuations were based on "straightforward, common sense calculations."  *James River Ins. Co. v. Rapid Funding, LLC,* 648 F.3d 1134 (10th Cir. 2011). Elieff's opinion was based on the May 2008 budget, which was derived from a Lehman-approved cash flow that was based on a variety of factors, including "costs and scheduling," "the market and timing going to market," and "market reports."  It "also included the anticipated gross and net revenue expected to be derived from placing the Project in a fully built-out condition based on the expenditures of all expenses in the cash flow."  This is hardly the "straightforward, common sense" calculation

1  contemplated by the *James River* court.  Furthermore, Elieff does not testify that he has

2  personal knowledge of any of the factors used to project revenues, nor does he justify

3  his use of the May 2008 budget in light of the Great Recession and collapse of the

4  California real estate market a few months later. Elieff's testimony clearly falls outside

5  the scope of admissible lay testimony.

6        Danielle Harrison's conclusion – again based on the May 2008 budget – that

7  SCM would be paid $21 million in management fees is also speculation.  Furthermore,

8  evidence of expected gross revenues alone provides no evidence of lost profits.

9        Both Elieff and Harrison's testimony are not admissible as lay testimony because

10  they are based on inadmissible hearsay: the May 2008 budget.  Furthermore, the

11  Defendants' initial disclosures under Fed. R. Civ. P. 26 did not indicate that Elieff or

12  Harrison would testify regarding SCM's alleged profits or damages.  The Defendants

13  are accordingly unable to use these witnesses to supply this information.  Fed. R. Civ.

14  P. 37(c).

15

16  **Defendants' Reply** – The Defendants argue as follows:

17        The Defendants have met their burden of proof as movants both by presenting

18  extensive evidence and showing the Trustee's lack of evidence on this issue.

19  "Showing" the Trustee's lack of evidence does not require an evidentiary showing, but

20  merely argument pointing out the Trustee's lack of evidence.  Under Ninth Circuit law,

21  either would be sufficient to shift the burden to the plaintiff Trustee.

22        SCM has presented evidence that $21 million in management fees were

23  expected to be paid to SCM upon completion of the DMA and that SCM anticipated a

24  10-15% profit margin on these fees.  It also presented evidence that the interim

25  payments to SCM under the DMA did not provide SCM with a net benefit, as SCM did

26  not expect the DMA to be profitable until the Project was completed and sold.  At the

27  time the parties stopped performing, SCM was suffering a net loss under the DMA.

28        The Trustee has presented no affirmative evidence that SCM has received an

1  unjust enrichment from the Debtor under the DMA.

2  Thus, the burden is now on the Trustee to establish this element of his unjust

3  enrichment claim. The Trustee should bear the risk of all difficulties of proof.

4  Presenting no evidence, the Trustee has failed to create a genuine issue of material fact

5  that SCM received a net enrichment under the DMA.

6  California law allows a breaching party – under a theory of unjust enrichment - to

7  recover benefits conferred on the non-breaching party minus damages to the non-

8  breaching party.  However, the innocent party (SCM) is entitled to no less than the

9  contract price and the breaching party should recover no more than the contract price.

10  Here, if money is returned to the Trustee, the Debtor will have paid less than it is

11  contractually obligated to pay and would be unjustly enriched.

12  Mr. Elieff's testimony is factual – rather than expert – in nature: identifying

13  product costs and partial payments received.  Numerous courts have recognized a

14  business owner's ability to testify about his business's costs and profit margins.  His

15  testimony is also plainly supported by an adequate foundation: he was owner and

16  manager of SCM and had personal knowledge of SCM's business operations and

17  profits and costs.

18  SCM's additional damages in lost profits can be measured by the termination

19  provision in the DMA, which gave SCM 90% of the management fees that would have

20  been payable if SCM had not been terminated.  The Debtor's breach is effectively a

21  termination of a contract, as SCM was excused from further performance.  SCM would

22  have been contractually entitled to this 90% of the $21 million, minus the $4 million in

23  management fees SCM had already been paid.

24  The Trustee's evidentiary objections to the Project Budget are inapplicable to this

25  analysis, because the Project Budgets were part of the parties' contract and are used to

26  establish the parties' agreement as to the damages that SCM was entitled to.

27  Authenticated contracts are admissible as evidence. The historical projection of sales

28  revenues was used to calculate the agreed upon monthly payment of management fees

1   to SCM.  Thus, the May 2008 Budget and the DMA taken together are an admission by

2   the Debtor of SCM's damages.

3         Mr. Elieff and Ms. Harrison's testimony are admissible under Fed. R. Evid. 701.

4   Numerous courts have recognized a business owner's ability to testify about his

5   businesses costs and profit margins.  The same holds true for employees, such as Ms.

6   Harrison.  Lost profits in particular can be testified to by lay witnesses.  Their testimony

7   is supported by an adequate foundation showing their personal knowledge.

8         Both Elieff and Harrison - and their potential testimony - were properly disclosed

9   to the Trustee.

10

11   **<u>Analysis</u>**

12         The Trustee is seeking the restitution of approximately $4 million in management

13   fees and $3 million in expense reimbursement paid by the Debtor to SCM.  As

14   discussed in the Memorandum quoted above, under California law the Trustee is

15   entitled to restitution only to the extent that this $7 million exceeds SCM's damages

16   arising from the Debtor's breach of the DMA.

17

18     I.   <u>Trustee's Burden of Proof</u>

19         There is no question that the Trustee would have the burden of proof on this

20   issue at trial.

21
22         To have the benefit of the rule against unjust enrichment, the burden of proof is
      upon the defaulting vendee to show that the payments made by him exceed the
      vendor's damages. *Major-Blakeney Corp. v. Jenkins*, 121 Cal. App. 2d 325, 332,
23         263 P.2d 655; *Baffa v. Johnson*, 35 Cal. 2d 36, 40, 216 P.2d 13.

24   *Bird v. Kenworthy*, 43 Cal. 2d 656, 659 (1954); *see also, e.g., Harriman v. Tetik*, 56 Cal.

25   2d 805, 811 (1961) (a willfully defaulting party may recover consideration paid to the

26   extent he could show it exceeded damages to other party); *Grill v. Hunt*, 6 Cal. App. 4th

27   73, 78–79 (Cal. Ct. App. 1992)("The rule in California seems clear that following

28   rescission of a contract, the burden of proving entitlement to restitution or offset is on

1    the defaulting party.")

2

3    II.    Defendants' Burden of Production

4        However, the Defendants carry an initial burden of production in their MSJ, as

5    the Ninth Circuit has explained:

6            A moving party without the ultimate burden of persuasion at trial - usually,
        but not always, a defendant - has both the initial burden of production and the
7        ultimate burden of persuasion on a motion for summary judgment. *See* 10A
        Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and
8        Procedure § 2727 (3d ed.1998). In order to carry its burden of production, the
        moving party must either produce evidence negating an essential element of the
9        nonmoving party's claim or defense or show that the nonmoving party does not
        have enough evidence of an essential element to carry its ultimate burden of
10       persuasion at trial. *See High Tech Gays v. Defense Indus. Sec. Clearance
        Office*, 895 F.2d 563, 574 (9th Cir.1990). In order to carry its ultimate burden of
11       persuasion on the motion, the moving party must persuade the court that there is
        no genuine issue of material fact. *See id.*
12           If a moving party fails to carry its initial burden of production, the
        nonmoving party has no obligation to produce anything, even if the nonmoving
13       party would have the ultimate burden of persuasion at trial. *See Adickes v. S.H.
        Kress & Co.*, 398 U.S. 144, 160, 90 S. Ct. 1598, 26 L. Ed.2d 142 (1970); *High
14       Tech Gays*, 895 F.2d at 574; A. Friedenthal, A. Miller and M. Kane, Civil
        Procedure 460 (3d ed.1999). In such a case, the nonmoving party may defeat
15       the motion for summary judgment without producing anything. *See High Tech
        Gays*, 895 F.2d at 574; *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 607 (11th
16       Cir.1991). If, however, a moving party carries its burden of production, the
        nonmoving party must produce evidence to support its claim or defense. *See
17       High Tech Gays*, 895 F.2d at 574; *Cline v. Industrial Maintenance Eng'g. &
        Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir.2000). If the nonmoving party fails
18       to produce enough evidence to create a genuine issue of material fact, the
        moving party wins the motion for summary judgment. *See Celotex Corp. v.
19       Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) . . . .

20   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

21       Thus, to be granted summary judgment on this unjust enrichment claim, the

22   Defendants must first meet their burden of production by either (i) producing evidence

23   that the payments to SCM did not exceed SCM's damages arising from the Debtor's

24   breach of contract or (ii) showing that the Trustee does not have enough evidence on

25   this issue to carry the Trustee's ultimate burden of persuasion.

26

27   A.    Evidence that Payments to SCM did not Exceed SCM's Damages

28       It is black letter law that damages for breach of contract are measured as

expectation: what is required to put the non-breaching party in the same place as

performance of the contract would have.

> Damages in breach-of-contract cases are ordinarily measured by the expectations of the parties. The court should seek to protect the nonbreaching party's "expectation interest."
> Expectancy damages or benefit-of-the-bargain recoveries award damages for the reasonably expected value of the contract. The purpose of expectancy or expectation damages is to make the nonbreaching party whole by providing it with the benefits it expected to receive from the contract had the contract been performed, or had the breach not occurred, less proper deductions.

22 Am. Jur. 2d Damages §53. The DMA called for SCM to receive Management Fees

equaling 4% of the gross sales revenues of the Project and reimbursement for all

reimbursable expenses. DMA §5.1, §5.3. On the other hand, to fully perform the DMA,

SCM would have incurred expenses, both reimbursable and not-reimbursable. DMA

§5.2, §5.3.

The reimbursable expenses incurred by SCM and the expense reimbursements

payable by the Debtor to SCM exactly offset one other. The expense reimbursement

payments were made to SCM on account of expenses SCM paid in developing the

Project. *See* Exhibit 33 to Supplemental Declaration of Tom Rollins filed in support of

Defendants' Supplemental Statement; DMA §5.3. (The Trustee has offered no evidence

indicating that the parties deviated from this contractual provision.) Thus, the $3 million

of expense reimbursements paid to SCM provided no net benefit to SCM, because

SCM had paid the same amount to third party vendors on the Project.  Looking forward

to calculate SCM's expectancy damages, SCM's prospective right to receive expense

reimbursement would be offset by its incurrence of reimbursable expenses, except to

the extent that SCM had incurred reimbursable expenses that had not yet been

reimbursed.

Accordingly, after the DMA had been fully performed, SCM would have been

expected to receive – *on a net basis* - its management fees (4% of gross sales

revenues) less its non-reimbursable costs of performance, *i.e.,* its profits from the DMA.

To get SCM to this place from where SCM stands today, SCM's contractual damages

would need to include both expected profits and unreimbursed expenses already

incurred (both non-reimbursable expenses and reimbursable expenses that had not yet

been reimbursed) by SCM in performing the DMA.  It should also be noted that *either*

expected net profits or unreimbursed costs in excess of $4 million would be sufficient to

deny SCM's claim for unjust enrichment.


### 1.   Unreimbursed Expenses Incurred by SCM

SCM has submitted evidence that it performed massive amounts of work

developing the Project between 2006 and 2008.  Bruce Elieff – SCM's owner and

Manager - has testified that the unreimbursed costs and expenses associated with

providing project management services on the Project exceeded the $4 million

payments of Management Fees, such that SCM suffered a "net loss" on the Project.[3]

Supplemental Declaration of Bruce Elieff submitted in support of Defendants'

Supplemental Statement ("Supp. Elieff Dec.") ¶13, ¶15.  Half of the Management Fee

payments occur only upon sales of completed lots, while almost all of the costs of sales

and development occur before that date.  *Id.,* DMA §5.1.  As a result, SCM did "not

profit on a particular project, including the Oak Knoll Project, until the residential and/or

commercial lots were completed and sold . . . ."  Supp. Elieff Dec. ¶13.

The Trustee argues that SCM's "net loss" on the DMA is unsupported by

admissible evidence: Mr. Elieff lacks personal knowledge of SCM's net profits (or

losses) under the DMA, his testimony relies on hearsay, and he cannot offer admissible

expert testimony or lay testimony.  For this last point, the Trustee argues that Mr. Elieff

was not qualified as an expert witness, he was not included in expert witness

disclosure, and his reliance on specialized knowledge and industry standards precludes

his giving lay opinion testimony.  The Trustee also argues that the Defendants did not

disclose – as required by Fed. R. Civ. P. 26 - that Mr. Elieff would be testifying

---

[3] This testimony by Mr. Elieff does not calculate "lost profits."  Instead, this testimony provides evidence of
historical profit or loss under the DMA.

1  regarding lost profits or damages.

2       The Trustee's arguments are not well taken.

3       Mr. Elieff's declaration does lay a proper foundation demonstrating Mr. Elieff's

4  personal knowledge about SCM's revenues and profitability.  He states that he

5  "personally monitored, participated in and oversaw others who also participated in each

6  facet of SCM's business and the day-to-day activities performed by SCM as

7  development manager," "personally monitored and participated in evaluations of the

8  costs SCM incurred in its business and profits generated from its business and

9  contracts under which SCM operated including the contractual relationship between

10  SCM and the Debtor," and "relied on [his] personal knowledge and [his] review of SCM's

11  business records, maintained under his supervision and control, including memoranda,

12  reports and records of acts, events, and transactions made in the regular course of

13  SCM's business at or near the time of the act, event or transaction."  Supp. Elieff Dec.

14  ¶3, ¶4.

15       His testimony is lay opinion testimony admissible under Fed. R. Evid. 701. While

16  the Trustee argues that Mr. Elieff's testimony is based on "scientific, technical, or other

17  specialized knowledge within the scope of Rule 702 [governing expert witness

18  testimony] and thus is barred by the express language of Rule 701, the comments to

19  Rule 701 state:

20

21      The amendment is not intended to affect the "prototypical example[s] of
the type of evidence contemplated by the adoption of Rule 701 relat[ing] to the
appearance of persons or things, identity, the manner of conduct, competency of
22  a person, degrees of light or darkness, sound, size, weight, distance, and an
endless number of items that cannot be described factually in words apart from
23  inferences." *Asplundh Mfg. Div. v. Benton Harbor Eng' g,* 57 F.3d 1190, 1196 (3d
Cir. 1995).

24      For example, most courts have permitted the owner or officer of a
business to testify to the value or projected profits of the business, without the
25  necessity of qualifying the witness as an accountant, appraiser, or similar expert.
*See, e.g., Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir. 1993) (no
26  abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony
as to damages, as it was based on his knowledge and participation in the day-to-
27  day affairs of the business). Such opinion testimony is admitted not because of
experience, training or specialized knowledge within the realm of an expert, but
28  because of the particularized knowledge that the witness has by virtue of his or
her position in the business. The amendment does not purport to change this

analysis.

Comments to 2000 Amendments to Fed. R. Evid. 701.

In this case, the DMA's profitability for SCM is the type of "particularized knowledge that the witness [Mr. Elieff] has by virtue of his … position in the business [SCM's owner and Manager]." *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995)("a president of a company, such as Cook, has "personal knowledge of his business ... sufficient to make ... [him] eligible under Rule 701 to testify as to how lost profits could be calculated"), *cert. denied.*, 516 U.S. 1114 (1996); *State Office Sys. v. Olivetti Corp.*, 762 F.2d 843, 846 (10th Cir. 1985)("given Mr. Springer's position as president and treasurer of the company, his lengthy experience in marketing and selling Olivetti computers in Kansas, and his personal knowledge of SOS operations, sales, and profits, he qualified as a witness able to render an opinion concerning SOS's lost future profits"*); Farina v. Compuware Corp.,* 256 F. Supp. 2d 1033, 1045 (D. Ariz. 2003)("Plaintiff's analysis is admissible as the opinion testimony of a lay witness under Fed. R. Evid. 701; she has a unique familiarity with the record-keeping and business operations of Defendant and had personal knowledge of the documents upon which she relies for her calculations.")

*Bona Fide Conglomerate, Inc. v. SourceAmerica,* 2017 WL 3149578, at *10 (S.D. Cal. July 24, 2017)("Lopez testifies as to Bona Fide's past profit margins . . . as permitted by Federal Rule of Evidence 701").

> [T]he Third Circuit has recognized that "when a lay witness has particularized knowledge by virtue of [his] experience, [he] may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." *Donlin v. Philips Lighting N. Am. Corp.,* 581 F.3d 73, 81 (3d Cir.2009).

*Philadelphia Workforce Dev. Corp. v. KRA Corp.*, 156 F. Supp. 3d 616, 634 (E.D. Pa. 2016), *aff'd*, 673 F. App'x 183 (3d Cir. 2016).

*James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011), which the trustee relies upon, is distinguishable.  The Tenth Circuit ruled that a

1  valuation of a building was based on "technical or specialized knowledge," because it

2  required a complicated depreciation calculation (involving the interaction between

3  depreciation and damages) and relied on both the owner's professional experience in

4  real estate and a technical report by an outside expert.  Furthermore, landowner

5  testimony about land value is generally considered to be expert testimony.

6      In fact, Mr. Elieff's knowledge that SCM was in a net loss position on the DMA is

7  the type of "straightforward, common sense calculation[s]" that James River cited as

8  admissible under Rule 701: a simple calculation of net profits – revenues (management

9  fees) received less expenses incurred. *James River*, 658 F.3d at 1216. If this calculation

10  were too complicated for business owners to testify about, no business owner could

11  testify as to the profitability of a business.

12      Alternatively, SCM's profitability (or lack thereof) is admissible as a matter of fact:

13  the historical results of SCM's business operations on the Project.  *See United States v.*

14  *Kayne,* 90 F.3d 7, 12 (1st Cir. 1996)("purchasers from RCGA were permitted to testify

15  about the price they realized on resale of the coins…. This testimony was not opinion

16  testimony at all, but a simple recitation of an observed phenomenon: the price paid for

17  the coins."), *cert. denied*, 519 U.S. 1055 (1997); *Pena v. Ludwig*, 766 S.W.2d 298, 304

18  (Tex. App. 1989)("Ludwig testified from actual, personal knowledge about Haircrafters'

19  financial condition as well as Lone Star's six-month profit, which she used as the

20  beginning point for calculating Haircrafters' probable loss. This was not opinion

21  testimony on her part, but testimony based upon first-hand knowledge of their business

22  records.")

23      Furthermore, Mr. Elieff's testimony is not based on hearsay, but his personal

24  knowledge of SCM's net loss on the DMA.

25

26          Here, Lopez [the CEO ] testifies as to Bona Fide's past profit margins—not lost
        profits—as permitted by Federal Rule of Evidence 701. And SourceAmerica's
        objections to Lopez's methodology go to the weight, not the admissibility, of the
27      evidence.
            SourceAmerica asserts that the evidence is inadmissible double hearsay.
28      However, Lopez may provide live testimony as to his personal knowledge and
        calculation of Bona Fide's past profit margins at trial, and Bona Fide may produce

its underlying financial records as business records under Federal Rule of Evidence 803(6).

Finally, SourceAmerica asserts that the evidence does not meet the best evidence rule. However, Bona Fide is not establishing the content of its profit and loss records, but its average profit margin, a number derived from the records. As the Advisory Committee's Note to Federal Rule of Evidence 1002 states,

[A]n event may be proved by nondocumentary evidence, even though a written record of it was made. If, however, the event is sought to be proved by the written record, the rule applies. For example, payment may be proved without producing the written receipt which was given. Earnings may be proved without producing books of account in which they are entered.

Fed. R. Evid. 1002 advisory committee's note.

*Bona Fide Conglomerate*, 2017 WL 3149578, at *10.

Finally, while the Defendants' Rule 26 disclosure of what discoverable information Mr. Elieff might have [quoted on p. 10 of the Opposition] did not specifically mention net profits or losses under the DMA, it did mention topics that would include such results from operations: the "functioning of [SCM]," "the payment of management fees and development fees and expenses to [SCM]," and "the development of the Project."  Furthermore, it cannot be a surprise to the Trustee that the owner and Manager of SCM would have knowledge of the results of SCM's operations.  Thus, to the extent that this disclosure did not specifically include the profit/loss resulting from SCM's performance under the DMA, such omission is harmless and does not warrant sanctions.  Fed. R. Civ. P. 37(c).

Accordingly, Mr. Elieff's testimony that SCM's already incurred costs of performance under the DMA exceeded the monies SCM had received from the Debtor is admissible.  This alone is sufficient to find that SCM's damages from breach exceed the payments it received, without even including SCM's expected profits in the calculation of damages.

### 2.  Expected Net Profits

The Defendants argue – based on testimony by Mr. Elieff and Danielle Harrison (an employee of SCM) and the May 2008 Project Budget – that gross sales revenue for the Project was expected to be over $522 million, resulting in almost $21 million in

management fees to SCM. The Defendants also rely on testimony from Mr. Elieff stating
that SCM hoped to achieve a profit margin of 10-15% on this $21 million.  Applying the
10-15% profit margin to the $522 million gross sales revenue figure, the Defendants
argue that SCM expected to receive $2.1 - $3.15 million in net profits if the DMA had
been fully performed.

### a.  Expected Management Fees

The expected management fees of $21 million are based on the gross sales
revenue figure of $522 million from the May 2008 Project Budget.  Exhibit 23 to
Declaration of Danielle Harrison submitted in support of the MSJ ("Harrison Dec."). The
May 2008 Project Budget has been authenticated - by Ms. Harrison (who was
personally involved in the development of project budgets) - as reflecting an agreement
among the parties as to the anticipated revenue and expenses numbers that they would
use in managing the Project, which was regularly updated by SCM and Lehman. *See*
Harrison Dec. ¶9-¶13, ¶26, ¶27. It is not hearsay under Fed. R. Evid. 803(6))("business
records").  Mr. Elieff has testified in support of this gross sale figure as the "parties good
faith estimate."  Supp. Elieff Dec. ¶18.

The Trustee argues that the testimony of Bruce Elieff and Danielle Harrison
regarding this gross sales revenues figure is not admissible as expert testimony or lay
testimony.  However, Mr. Elieff and Ms. Harrison are not relying on hearsay when they
cite the May 2008 Project Budget; they are authenticating that document. This
authentication is factual testimony, not opinion.

The Trustee also objects to Mr. Elieff and Ms. Harrison's testimony as lacking
personal knowledge. But, as discussed in detail in 1. above, Mr. Elieff's declaration
does lay a proper foundation for his personal knowledge of SCM's operations generally.
He has also testified to his personal involvement in creating project budgets.  Supp.
Elieff Dec. ¶16. Ms. Harrison provides a strong foundation for her testimony, as well.
She testifies in detail about her personal involvement in the business plan and

budgeting process for the Project. Harrison Dec. ¶1-¶4, ¶5, ¶7.

The Trustee argues that Mr. Elieff and Ms. Harrison's testimony was not adequately disclosed under Rule 26. However, the Defendants' disclosure on Mr. Elieff specifically mentions budgets.  Disclosure on Ms. Harrison is more limited, but the Trustee cannot be surprised that an SCM employee with "asset management responsibility" [a description of Ms. Harrison in the disclosure] would testify as to the budgeting process.

Finally, the Trustee argues that the $522 in gross sales revenue is based on the May 2008 Budget, but that budget overstates anticipated gross sales revenue because several months later the great recession sharply reduced the value of California real estate.  While the May 2008 Budget may not reflect the effects of the 2008 recession, it appears to be the most recent budget and good faith estimation of expected gross sales revenue from the Project.  The Trustee, as the successor to the breaching party, cannot insist that SCM provide perfect proof of its expectancy damages, which are by their very nature hypothetical.  As one California Court put it: "any difficulty in proof should not inure to the benefit of the party responsible for the failure of the contract." *Grill v. Hunt*, 6 Cal. App. 4th at 79.

> Given the difficulty in many circumstances of quantifying the injury to the defendant from the claimant's breach, the appropriate reduction may be liberally estimated. The object is to insure that the nonbreaching defendant will under no circumstance be left with a net loss from the transaction; and a party who has elected not to perform the contract cannot insist on a nice calculation of extracontractual benefits conferred.

Restatement (Third) of Restitution and Unjust Enrichment § 36 (2011)(comment c).

## b. Expected Profit Margins

The Trustee makes the same evidentiary and procedural objections to Mr. Elieff's testimony of a 10-15% anticipated profit margin, but this testimony is admissible under the federal rules.  As discussed in detail in 1. above, (i) Mr. Elieff's declaration does lay a proper foundation for his personal knowledge of SCM's historic profitability, on which

1   this estimate is based, (ii) he is exactly the type of business owner/manager that the

2   comments to 2000 Amendments to Fed. R. Evid. 701 and the case law have allowed to

3   give lay opinion testimony on profitability, and (iii) Rule 26 disclosure on Mr. Elieff was

4   sufficient to put the Trustee on notice that Mr. Elieff – as owner and Manager - had

5   knowledge of SCM's profit margins.

6

7                       c.   Calculation of Expected Profits

8          Taking the $522 million of gross sales revenue from the May 2008 Project

9   Budget, the 4% Management Fee provision from the DMA, and SCM's 10-15%

10  expected profit margin from Mr. Elieff's testimony, the Defendants have provided

11  admissible evidence of $2-$3 million of lost profit damages.  These lost profits do not

12  exceed the $4 million in management fees paid to SCM.  However, the Defendants'

13  evidence (described in 1. above) that SCM's unreimbursed expenses exceed payments

14  received from the Debtor alone is sufficient to carry the Defendants' burden of

15  production on the issue of whether SCM's damages exceed the Debtor's payments to

16  SCM.  The additional $2-$3 million of damages from lost profits merely reinforces the

17  conclusion that they do.

18

19                       d.   Liquidated Damages

20         The Defendants also point to §6.2 of the DMA, which provides that if the Debtor

21  terminates the DMA without cause, SCM is entitled to receive a termination fee of 90%

22  of the management fee that would have been payable to SCM (less any management

23  fees already paid). Under this provision, the Defendants' argue that SCM would be

24  entitled to 90% of $21 million anticipated management fees ($18.9 million) less the $4

25  million already received for damages of $14.9 million. The Trustee argues that §6.2 is

26  not applicable because the Debtor breached the contract, which is different from

27  terminating without cause.

28         At this point, it is not clear to the Court whether §6.2 would apply to the Debtor's

1    breach of the DMA. Many decisions have held that breach and repudiation do not

2    terminate the contract, but merely provide grounds for termination by the non-breaching

3    party.  *See, e.g., Taylor v. Johnston*, 15 Cal. 3d 130, 137 (Cal. 1975); *Whitney Inv. Co.*

4    *v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 602 (Cal. Ct. App. 1969) ("A breach does

5    not terminate a contract as a matter of course but is a ground for termination at the

6    option of the injured party."); *Larson v. Warner Bros. Entm't Inc.*, 2013 WL 1164434, at

7    *3 (C.D. Cal. Mar. 20, 2013), *judg. entered*, 2013 WL 4101539 (C.D. Cal. June 18,

8    2013), *and aff'd*, 640 F. App'x 630 (9th Cir. 2016).  On the other hand, at least one court

9    has equated repudiation of a contract - expressly refusing to perform – with

10   "termination" in a liquidated damages clause. *See Jiu Zhou Grp. (HK) Holding Ltd. v. M.*

11   *Bros.*, 2017 WL 2829532, at *13 (Cal. Ct. App. June 30, 2017)("We conclude that the

12   term "unilateral terminat[ion]," as found in the liquidated damages provision, is intended

13   to refer to a repudiation of the contract.")

14          The Court need not decide whether §6.2 is applicable, because – as described

15   above – the Defendants have met their burden of production on the issue of whether the

16   SCM's damages exceed the Debtor's payments to SCM.

17

18          3.  Attorneys' Fees

19          The DMA provided that:

20   In the event of any conflict or dispute with respect to the enforcement or
     interpretation of any of the terms or provisions of this Agreement, the prevailing
21   party shall be entitled to recover from the other party all costs, expenses and
     attorneys' fees incurred in connection therewith, including expenses of
22   arbitration.

23   DMA §9.6.  The Defendants have been granted summary judgment on the Trustee's

24   first claim for *breach of the DMA*, which certainly falls with the category of enforcement

25   of the DMA. This second claim for restitution/unjust enrichment requires calculation of

26   SCM's damages arising from the Debtor's breach of the DMA, which requires

27   interpretation of the DMA (as is evident from this ruling).  Thus, under DMA §9.6, SCM

28   is entitled to its costs, expenses, and attorneys' fees for its litigation of the first claim and

1   – if granted summary judgment on the second claim – for its litigation of the second

2   claim. Such fees should be included in SCM's damages arising from the Debtor's

3   breach.  Fortunately, the amount of such damages need not be determined in the

4   context of this MSJ, because – as described above – SCM has presented evidence that

5   its contractual damages exceed payments received from the Debtor - without

6   consideration of attorneys' fees.

7

8   B.  Showing an Absence of Evidence that Payments to SCM exceed SCM's

9   Damages

10      The Ninth Circuit has explained that "showing" a lack of evidence may be done

11  simply by argument:

12

13      When the nonmoving party has the burden of proof at trial, the moving party
        need only point out "that there is an absence of evidence to support the
        nonmoving party's case." *Id.* at 325, 106 S. Ct. 2548; *see also Fairbank v.*
14      *Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000) (holding that the
        *Celotex* "showing" can be made by "pointing out through argument—the absence
15      of evidence to support plaintiff's claim").

16  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  This conclusion is based on

17  the language of the *Celotex* decision:

18      But we do not think the *Adickes* language quoted above should be construed to
        mean that the burden is on the party moving for summary judgment to produce
19      evidence showing the absence of a genuine issue of material fact, even with
        respect to an issue on which the nonmoving party bears the burden of proof.
20      Instead, as we have explained, the burden on the moving party may be
        discharged by "showing"—that is, pointing out to the district court—that there is
21      an absence of evidence to support the nonmoving party's case.

22  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

23      The Defendants have repeatedly pointed out that the Trustee has failed to put

24  forth any evidence that the Debtor's payments to SCM exceed SCM's damages.  The

25  Memorandum put this issue squarely before the parties, asking them to "provide

26  evidence of the amount of SCM's damages."  As the Defendants point out, the Trustee's

27  Supplemental Opposition lacks any such evidence and is based primarily on evidentiary

28  objections to the Defendants' evidence.  Thus, the Defendants have also met their

1    burden of production by pointing out the Trustee's lack evidence.

2    (On the other hand, the Defendants have not presented *evidence* showing that

3    the Trustee lacks evidence to carry his burden of proof at trial.  The interrogatory

4    responses cited by the Defendants do not state that the Trustee lacks knowledge:  they

5    simply object to the interrogatory.  Declaration of Mark Gustafson submitted in support

6    of the Defendants' Supplemental Statement ¶2.  The Trustee's deposition testimony

7    does indicate that the Trustee lacks personal knowledge relevant to these issues, but

8    that does not mean that the Trustee and his attorneys do not have other evidence on

9    this point. Declaration of Aalok Sharma submitted in support of the Defendants'

10   Supplemental Statement ¶2.)

11

12   III.    Genuine Issue of Material Fact

13   As the Defendants have met their burden of production, the Trustee must

14   produce enough evidence to create a genuine issue of material fact. Otherwise, the

15   Defendants should be granted summary judgment. *See Celotex*, 477 U.S. at 322;

16   *Nissan Fire & Marine*, 210 F.3d at 1102–03.

17   As noted above, the Trustee has failed to produce any evidence that the Debtor's

18   payments to SCM exceeded SCM's expected damages from the Debtor's breach of the

19   DMA – despite the fact that the Court had continued this MSJ for the express purpose

20   of allowing the parties to present evidence on this issue.  Accordingly, the Trustee has

21   failed to carry his burden of proof and summary judgment for the Defendants is

22   appropriate.

23   This legal conclusion is buttressed by common sense.  Discovery has been

24   completed. The Trustee has the burden of proof on this issue. If the Trustee has no

25   evidence that the amounts paid to SCM by the Debtor exceed SCM's contractual

26   damages, taking this claim to trial would only result in wasted time and expense.

27   //

28   //

**Ruling**

Judgment is granted to the Defendants on the second claim for restitution and/or unjust enrichment.

**Evidentiary Objections**

The Trustee has interposed numerous objections to the testimony offered by the Defendants.  The Court will only rule on objections to the testimony used by the Court in this ruling.

Supplemental Declaration of Bruce Elieff
1 – sustained
2-8 – overruled
9 – sustained
10 – sustained as to the final sentence of the paragraph, otherwise overruled
11-17 - overruled
18 – sustained
19 – sustained as to the contents of other declarations, otherwise overruled
20-23 – overruled
24 – sustained
25 – overruled
26- sustained
27-28 – overruled
35 – overruled as to the first sentence, sustained as to the second
37 – overruled

Declaration of Danielle Harrison
1-2 – sustained
3-7 – overruled
6 (number repeated) – sustained
7 (number repeated) – overruled
8 – overruled
9 – sustained
10-20 – overruled
21 – sustained
22 – sustained as to the first sentence, overruled as to the second
23-27 – overruled
43 – overruled
44 – sustained
45 – overruled
46 – sustained
47 – overruled
48-49 – sustained
//

//

<u>Supplemental Declaration of Tom Rollins</u>
1 – overruled
5 – overruled

###

Date: November 27, 2017

_____
Geraldine Mund
United States Bankruptcy Judge